# THE PREROGATIVE COURT

OF

## THE STATE OF NEW JERSEY,

OCTOBER TERM, 1879.

THEODORE RUNYON, ESQ., ORDINARY.

DANIEL H. LEE and others, appellants,

*v.*

DAVID S. SCUDDER, executor, respondent.

Intermittent mental delusions resulting from and depending entirely on disease, and from which the testatrix was at other times free,—*Held*, not to have affected her testamentary capacity, it appearing that, when she executed her will, she knew what property she had, where and what it was, to whom she desired to give it, and why she selected her legatee and omitted others, and manifested no delusion.

Appeal from the decree of the Union orphans court, admitting to probate a paper writing purporting to be the last will and testament of Betsy Marsh, deceased, late of that county.

*Mr. J. Henry Stone*, for appellant.

*Mr. W. J. Magie*, for respondent.

Lee *v.* Scudder.

THE ORDINARY.

Betsy Marsh, a single woman, late of the county of Union, died there on the 7th of April, 1876, at the house of David S. Scudder, in the township of Westfield. She was then about sixty-five years old. She was eccentric. Her eccentricity displayed itself principally in her dress, which was somewhat peculiar, and in her language, which was sometimes very coarse. She died of a disease of the brain, after an illness of not many days' duration. The particular character of the disease seems not to be very exactly defined by the expert testimony which has been adduced. Her malady appears to have given rise to delusions at an early stage of it. One effect of its presence was to fill her mind with a distressing presentiment of impending death. On the 6th of May, 1857, nearly nineteen years before her death, she had made a will by which, after providing for the payment of her debts and funeral expenses, she gave to Daniel H. Lee half of her estate, except her clothing and household goods, which she gave to Sarah Lee, widow of Gershom Lee, and gave to Sarah Lee and Ezra D. and Charlotte Hetfield, all the residue of her estate. On the 29th of March, nine days before her death, she went to the house of Mrs. Phebe M. Hetfield, who lived in the immediate vicinity of David S. Scudder (the houses being a very short distance apart, with none intervening), and remained there until the 3d of April following, when she left that place and went to David S. Scudder's house, and there, on the 5th of April, two days afterwards, she executed her last will and testament, by which she gave her property to Mr. Scudder. He was her cousin, and for many years she had made his house her home, though from time to time she had stayed at other places among her relations. Between the 29th of March and the 3d of April, while she was at the house of Phebe Hetfield, it appears that she was the subject of delusions of such a character as to indicate the existence of mental disease. There is some contrariety, however, in the evidence, as to the extent of

Lee *v.* Scudder.

these aberrations. I do not deem it important to consider the evidence on this head, inasmuch ·as it appears to be quite clear that the delusions to which I have referred were the consequences of her disease, and the disease itself was intermittent, and it is clear, from the proof, that there were periods, whole days together, at least, after that time, when she was free from them. Her property appears to have consisted mainly of a bond and 'mortgage and a deposit in the savings bank. On Tuesday, the 2d of April, the day before the will was made, she seems to have been engaged in assisting in the ordinary household duties of the family. She retired to bed between eight and nine o'clock. At a very early hour (about three o'clock) the next morning, she came to the door of the room in which Mr. and Mrs. Scudder slept, and applied for admittance. On being admitted she sat down in a chair near the door. She said that she could not live a great while, and would rather that Mr. Scudder should have what little she had than any one else. Mr. Scudder endeavored to relieve her mind of the presentiment by assuring her that she was not about to die, and told her to go back to her room and go to bed. She did so. Not long afterwards she came again to his room and said to him, " Smith (addressing him by his middle name), I want to give you this mortgage and bank-book, and I wish I could hand them to you right in your hand;" to which he replied, " Betsy, you know you can't do that; you would be sorry for it if you did, afterwards;" to which she answered, " If I get well you can easily hand them back to me." He again persuaded her to return to her room. She came back again to his room, shortly afterwards, and then said, " I want to give you this mortgage and this bank-book; the will I have made don't give you anything; I want you to go and get Dr. Kinch to come and do some writing for me." Mr. Scudder said to her that he thought it was not worth while, and she replied, " Yes, it is; I shan't live long, and it makes no difference whether I live or die, I want you to go and get Dr. Kinch."

Dr. Kinch was a physician long a resident in the village of Westfield. He frequently drew wills. He was not the attending physician of the testatrix. Her physician was Dr. Stryker. About five o'clock in the morning Mr. Scudder went for Dr. Kinch, and he and the doctor reached his house at about six. It appears from Dr. Kinch's testimony that he had been for a long time well acquainted with the testatrix. He says that when he met her at the house she said to him, "Doctor, I want you to do some writing." He asked her what she wanted him to do, and she said that she wanted to make her will, and wanted it done right away. He told her that it was necessary to have another witness besides himself. He suggested that Samuel Hetfield, son of Phebe Hetfield before mentioned, should be sent for as a witness, but she objected, and suggested Mr. French, a neighbor, who was sent for accordingly. She wished Dr. Kinch to act as executor, but he declined. They then went into a room together. He asked her if she had ever made a will before. She said she had. She remarked, "You want to see if I know what I am doing. I know what I am doing, just as well as I ever did." The doctor then said, "Well, Betsy, it is necessary for me to know whether you are competent to make a will or not." She replied, "I know just as well what I am doing as I ever did, and I want it done right away." He then asked her how she wished to dispose of her property, and she told him the manner, and he drew the will accordingly. After he had drawn the will he read it to her, paragraph by paragraph, and asked her if that was what she wanted, and she replied, "Yes." The will was then executed by her in the presence of the doctor and Mr. French, with due formality. It should be stated that when he asked her if she had ever made a will before, she said that she had done so while she was living at Mr. Lee's. That she had had it drawn while she was living there. She did not say what disposition she had made of her property in that will, but rather evaded the question. In her conversation pre-

Lee v. Scudder.

vious to the execution of the will, she told the doctor that she would burn her property all up before she would give any of it to the Marsh family. By way of explanation, she said that they had not given her much attention, had never befriended her, and the doctor thinks that she mentioned, as a cause of complaint, that they did not notify her of her father's death until after he was buried. As indicating the condition of her mind, it may be stated that, while the doctor was writing the will, she remarked that she had not had much enjoyment in this world, and she did not know whether she would have much in the world to come. She also said that she "expected there would be a great time after she was dead and gone, by her friends' overhauling her wonderful room," at Mrs. Hetfield's, where she kept her clothing and her mother's clothing. She added that she supposed there would be a great time amongst her old clothing, after she was dead and gone, but she did not care anything about that; they might, do as they had a mind to, it would not affect her, one way or the other. It appears that she had, for many years, rented a room in the house of Phebe Hetfield, where she kept her garments, and those of her mother (one of her eccentricities being the keeping, unused, her dresses, which were made of coarse material, and were of unfashionable cut), and she had, in that room, dresses of her own and her mother's, which she had kept there for many years.

Before the doctor began to draw the will, she showed him a bond and mortgage for $1,000, and a savings-bank book, and said she wanted to give the mortgage to Smith Scudder. She also said that wherever she was when she came to die, those who took the best care of her should have her property. After the will was executed, the doctor folded it up and handed it to her, and asked her what disposition should be made of it. She told him to take it and keep it. He did so. Afterwards, and on the same day, after the doctor had gone, she put on her dress and shawl and went out. She said that she had forgotten some things which she

Lee *v.* Scudder.

desired to put in her will. They were, a legacy of $100 to
the Baptist Church at Scotch Plains, of which she was a
member, and a provision for a head-stone for her grave, to
cost $200. As she left the house, she said she was going to
take a walk, and might go as far as Theodore Hetfield's (he
was a near neighbor), and, if she did, she would spend the
day there. She went to Theodore Hetfield's house, and,
while there, spoke of her desire to alter her will in the par-
ticulars just referred to. Mr. Hetfield called in her physi-
cian, Dr. Stryker, who happened to be passing. The doctor
undertook to make the alteration for her, but thought that
it was necessary to redraw the will. He proceeded to do so.
After he had drawn so much of the will as provided for the
payment of her funeral expenses and just debts, and for the
head-stone at her grave, he stopped writing, and suggested
to her the propriety of making a bequest to the children of
a Mr. Gardner, in whose family she had lived, and of whose
children she appeared to be very fond. To his suggestion
she made no answer except by shaking her head, signifying
an indisposition to make the bequest. It appears that the
drawing of the will was no further proceeded with. Mr.
Hetfield suggested that a difficulty might arise with respect
to the validity of the will, because of the fact that there
would be two wills, that drawn by Dr. Kinch in the morn-
ing, and the one upon which Dr. Stryker was engaged,
both dated on the same day. The further preparation of the
will was postponed until later in the day.

In her instructions to Dr. Stryker, the testatrix told him
that she wanted to give a legacy of $100 to the Scotch
Plains church, to have her funeral expenses paid, and $200
spent for a head-stone, and the rest of her property was to
go to Smith Scudder. She requested that Dr. Kinch should
be sent for to make the alteration, and Dr. Kinch and Dr.
Stryker came in the evening. She informed Dr. Kinch
of the alteration she desired to make. He, also supposing
it was necessary to draw a new will, took the will, which he
had brought with him, out of the envelope in which it was,

and proceeded to tear off the fly-leaf, and was about to destroy the will. She prevented him from doing so, saying: "Don't burn it up until there is another one made," and thereupon he folded up the will and put it in the envelope and gave it to Theodore Hetfield, to be kept by him. Dr. Kinch testifies that he told her that he understood she was not satisfied with the will he had made, and that she answered that all the change she wanted to make was that she wanted to give to the Baptist church $100, and spoke about a head-stone to cost $200.

It seems that the writing of the will was deferred until the next morning, because of the fact of the testatrix's unwillingness to make a disposition in favor of the Gardner children. Dr. Kinch testifies that before he left Theodore Hetfield's house, the testatrix joined the family, and was, with them, entertained with music. The next morning, before breakfast, she left that house, and appears to have drunk several times, immediately thereafter, of wine which she had in a bottle. Her habits were temperate, but she used wine occasionally, in very small quantities, as a medicine. It seems that, not long afterwards, she was found in what appeared to be an intoxicated condition, in the woods not far distant, whence she was taken to the house of Mr. Scudder. From that time she appears to have been quite ill, and the next morning she suddenly fell dead.

The only question which was presented to the court upon the hearing of this appeal was, whether the testatrix, at the time of making the will drawn by Dr. Kinch, was of sound and disposing mind. That she was not laboring under any delusion when the will was made, is abundantly evident from the testimony. It does not appear that, at any time, she labored under any delusion in respect to any person who would otherwise, probably, have been the object of her bounty. Her delusions were evidently such as resulted from disease, but, as before remarked, the disease manifestly was an intermittent one, and there were times when she was free from the delusions, and was rational and of sound

and disposing mind, memory and understanding. When the will was drawn, she knew what property she had, and where it was, and what it consisted of, and to whom she desired to give it, and the reason why she selected the person to whom she gave it, as the object of her bounty. She also gave her reason for passing by others in the disposition of her property. The testamentary witnesses, one of whom was an expert, had both of them known her for a long time, and testify very clearly and positively to the soundness of her mind at the time of the execution of the will. Other witnesses, notably Theodore Hetfield and his wife, who saw her on the day on which the will was drawn, give equally convincing evidence as to her testamentary capacity. Whatever her disease was, and however it may be characterized technically, it is clear that it could not have been one which affected the brain so that, when once it had taken hold of the patient, it never released its hold. The proof forbids such a conclusion. Among the witnesses who testified to the soundness of her mind and testamentary capacity, is Dr. Stryker, who was her attending physician during her illness, and up to her death.

The decree of the orphans court will be affirmed.